We'll turn to our second case on the argument calendar. We'll invite counsel to come up and get settled. The State Administrative Services versus City and County of Honolulu. Mr. Seitz. Morning. Thank you for the opportunity to be here this morning. With me at council table is Jonathan Liu who is my associate. This case as you know is about a helpless, homeless, mentally ill, obviously fragile woman who could not care for herself. She was arrested for being homeless, not for hurting anybody or threatening anybody or damaging anybody's property. She was arrested for being homeless. She was taken 25 miles from the area where she was arrested and where she is familiar and she was released five hours later without any means to get back to where she came from with no cell phone, no money, absolutely no way to retrace the steps that the police officers had taken when they brought her to the police station where she was basically first booked and then allowed to be released without bail. Counsel, what is the duty of care that the defendants owed Ms. Johnson? Well, in this case, the duty that they owed to Ms. Johnson was basically not to put her in a position of aggravated risk. That's the duty and that largely is what comes from Wood versus Ostrander and the cases that we've cited which come from all over the country. You don't arrest somebody and then leave them in some place where they could get raped which is what happened in Ostrander. You don't arrest somebody who's a driver of a car and leave his wife in the car who's inebriated who ultimately falls and almost kills herself. You don't send somebody who's out of a bar out into the street with extremely cold weather who then freezes to death and has no way to get home. Again, I think that in this case, there clearly was a duty not to aggravate the danger that this woman faced knowing already that she was fragile and had no resources to help herself. That is the fundamental duty. Now, the government argues, was it foreseeable that something would happen to her? Of course, it was foreseeable for all the reasons set forth in all of those other cases. This woman could not help herself. Whether she fell down, whether she didn't eat, whether she was somehow molested or beaten to death is what happened here. It was foreseeable that she was in the way of harm at risk. Then the situation was aggravated by the police when they released somebody who was absolutely violent, who was clearly mentally ill, who had just assaulted two people including a police officer and who was on furlough from the mental hospital. They just released him knowing that Mrs. Johnson was there and therefore created, specifically created, an additional risk which led to her death. Did they know she was still there when they released Armstrong? Yes, she remained on the premises. One reason we know that was because somewhere along the lines, a lieutenant called, very nicely, called a person who'd been providing mental health care for this for Mrs. Johnson to tell him that she was there on the premises and had no way to get back to Waikiki. That was the night before though? That, I think, was during the night sometime. We're not exactly sure when that happened. We also know the police knew that this beating was going on because a witness came in and reported it. A police officer who was at the desk took no steps. Now, we only just recently learned that police officer was fired because of her misconduct, her negligence. We only found that out last week in a public report that the police are required to make to the legislature every year for disciplinary actions they take against police officers. I take it this is not in the record here? It's not in the record because we only got that report last week. Are you saying this, she was terminated due to this incident? Yes, yes, absolutely. She was terminated because she ignored what was going on outside and she was fired for that reason specifically. Now, there's no question in our minds as to foreseeability here. Absolutely no question. It was foreseeable because this woman was so fragile that there were a whole variety of risks that she faced by just letting her out the door and taking no steps to see to it that she could retrace her steps. If Ms. Johnson hadn't been fragile, let's say she was perfectly fine but could not get back to Waikiki on her own, is allowing Mr. Armstrong to be released still giving rise and and let's assume he does the same thing, he kills her, would we still be here? I would still be here whether or not we'd have the stronger case or not because I've done a case like that in the past in state court here where somebody was released from the mental hospital and that's in the record actually in the transcript. We argued that to Judge Kobayashi where a person was released from the state hospital, walked out to a bus stop out in front of the state hospital and beat our client to death. So whether it provides a sufficient showing under federal law as to foreseeability and liability in the civil rights context, I don't know but I think it certainly does. In any event, I believe based on all of those cases that we've cited and there are several of them, the Wood v. Ostrander series of cases in our brief, I don't believe those cases can be ignored. I think by failing to apply that line of cases in this case, it would effectively just overrule those cases and say there's no duty when you have somebody who's fragile who you just release into a situation where it becomes more dangerous for that person than under normal circumstances. The second issue that we're very concerned about here, we filed this case in state court. It was removed to federal court. Judge Kobayashi, instead of just sending it back to the state courts to determine the issues of premises liability and the state law negligence claims, reached out and ruled on them and I do not frankly, after all this time, understand her ruling. At some point during the oral argument she commented, well, Ms. Johnson was not a business visitor on the premises of the police station but that really has very little to do as far as I can tell with the issues in this case. In our view, even if Judge Kobayashi was correct as to the federal claims of action, she should have remanded the case back to the state courts to determine what the extent of the liability was under the negligence claims that we brought. If you agree with Judge Kobayashi, and I certainly hope you don't, then I would at least request of you that you send the matter back with instructions that it be returned to the state courts for adjudication of the negligence claims. Let me go back just on the deliberate indifference. One question I had is the level of generality you're asking us to use here because one argument could be when you released from custody a homeless person who is far away from her normal area, she's going to be subjected to some harm. We don't know what that is but it's something. Another way, a more tighter argument is to say she would be subjected to this harm, the harm that ultimately came to befall her here. What are you arguing, guys, between those two? Well, again, Judge Bress, I think you've got to look at Wood v. Ostrander, which is the primary case on which we rely. In that case, the driver of the woman was left. There was no specific risk. It was apparently a dangerous part of town and she was raped by somebody who came along and offered her a ride. That wasn't specifically foreseeable. I think if you go through all of those cases, now the cases of cold weather, I guess you can sort of indicate, well, they should have known because there was cold weather, people freeze when you go outside, but the cases involving the woman who was inebriated whose husband was arrested for drunk driving, the case where the three kids were left in the car, you didn't have specific risks. Those were situational allegations where there was a general danger to these people that was aggravated by the actions or omissions of the police. In that situation, the courts have found a duty and I think that's correct. I think clearly in this case, this woman, if they'd given her bus fare, if they'd helped her get on a bus or if they'd helped her call somebody who could come get her and bring her back. When she wasn't homeless, she was living in facilities that were provided for homeless people in the Waikiki area and she had a mental health counselor who was helping her from time to time. Didn't they call? No, they did not. Not well. Only the lieutenant called to tell that guy that she's still out here. That was the one call, but she'd already been released for several hours by that time and she was hanging around on the police station premises. That's the one call that was made. Hey, do you know that the person you're helping is out here and and and he said no. He didn't know, but then after that nothing happened. Now maybe he could have come and gotten her. I don't know. He works for, apparently, so we've never talked to him and you know, apropos of something that came up in the in the previous argument, in this case, bear in mind that discovery was cut off when the motion to dismiss was was filed. We were only given the police report reports and we were told that we could not conduct further discovery. So all we have is the police reports. In my view, it would have been very easy to take depositions and conduct discovery in this case, to create much more specific facts to determine what the circumstances were at every stage of this when Ms. Johnson was arrested, when she was released, and who was responsible for all of the events that ensued, but we were not given that opportunity. In my view, this is not a case that should have been resolved on a motion to dismiss. Based on the case law that we've cited to you, there were certainly many cases that speak to foreseeability and speak to the nature of the duty that certainly should have gotten us by a motion to dismiss. So the duty extends beyond them calling and saying, hey, we released this person who we know appears to have issues, we know you're working with her. Why is that not enough? Well, I don't believe that extinguished the duty because it didn't provide any relief to her in terms of a way to get home, a way to get back to where she was familiar, a way to get back to people who could help her. It was just alerting somebody, hey, this person's in danger. In fact, in some respect, the fact that they made that call, in our view, strengthens the claim that they knew that this woman was in danger and was at risk. But in my view, the duty was further than that. Yes, you don't leave kids in a car at night and require them to cross an eight-lane highway to look for help. You don't leave somebody inebriated in a car who is likely to have an experience which is going to be harmful to her. Unlike your car analogy, though, about the kids having to cross the highway, they did call. In that situation, there was no call. In this situation, there was a call. The person that they called, though, and I understand your position, we haven't done discovery judge, we don't know what really happened yet, but they did call. Yes, there was one call, but I don't believe that had any impact whatsoever on reducing the risks that this woman faced in the time frame that she did, which led up until her death. I don't believe it had any impact whatsoever. It was nice that they called. It reflects that they knew that she was in danger and at risk, but it didn't alleviate or reduce the risk in any manner whatsoever. Is there any requirement that they had to act with malice? There is a requirement under negligence law for the state of Hawaii as to employees of police departments and city and state employees that they have to act with malice. In our view, based on what we just found out about the officer who was fired, I think factually we could prove that, but we haven't done discovery on that issue because it hasn't been provided to us. Yes, I think we can prove malice in this case. This is a horrific case. I'm going to save some time for rebuttal. No, I'm done. Thank you, Rex. I've got a minute and a half. We'll see what happens, but I appreciate you back up for rebuttal. Thank you. Thank you. Thank you all. Good morning, Your Honors. Catherine Neste, Deputy Corporation Counsel here on behalf of the City and County of Honolulu. I just want to start with what I've heard from plaintiff's counsel this morning does not change the fact that they have not plausibly pled in their first amended complaint. Any of the alleged facts to support the moving force requirement, first of all, in regards to the temporary transport directive and the arrest policy approximately causing Ms. Johnson's death, nor have they plausibly pled the state created danger exception in regards to any officer's affirmative action creating a particularized danger to Linda Mae Johnson of being beaten to death by Mr. Armstrong. And finally, in regards to the negligence claim, plaintiff still in the first amended complaint has not plausibly pled any recognized special relationship that would create a duty or has not shown any officer acted with actual malice toward Ms. Johnson in order to sustain that negligence claim. If I may address a few of the things that plaintiff's counsel had stated this morning, he pointed to the phone call from the Lieutenant, Lieutenant Wong, calling to say that I believe he stated that she was there on the premises still. That is not in the record. If you look at what's in the actual first amended complaint, there is one reference to the phone call by Mr. Excuse me, by the Lieutenant that is in paragraph 18. And it simply said that it was at 1015 on the evening that she was released saying that she had been taken into custody. She was unable to care for herself, was suffering from paranoia and anxiety, but in nowhere in the record does it say that the Lieutenant knew that she was still on the premises. In regards to plaintiff's counsel's comment as to Officer Cesar, again that new information is not in the record. We were not provided with that information prior to today's argument. My comment about Officer Cesar... Are you referring to the determination of Officer Cesar? Is that what you're referring to? Yes, yes, Your Honor. Specifically speaking to Officer Cesar's actions in this case as it's pled in the first amended complaint, it only alleges in paragraph 21 that a bystander, Mr. Smith, informed Officer Cesar that a woman outside was in need of emergency assistance. It doesn't identify who that woman was. It doesn't allege that Officer Cesar knew that that woman was Linda Mae Johnson. It also doesn't allege that she, that Officer Cesar knew that Linda Mae Johnson was in any position to be threatened, to be assaulted by Mr. Armstrong, which I think plaintiff's counsel has mentioned in his argument today something specific about Mr. Armstrong or knowing that Mr. Armstrong was out there with Ms. Johnson and that he was beating her to death. That is also not in the record before you that anyone knew on behalf of HPD that Ms. Johnson was being beaten to death at the time that she was beaten to death. So they may not have known that it was Ms. Johnson in particular, but they were put on notice that somebody was being beaten, correct? After the fact. So after Mr. Smith, the bystander, he had notified Miss Officer Cesar that there was a woman outside who was in need of whatever emergency assistance is meant to be, but not that she was being beaten. And then Mr. Smith went back into the police station and it wasn't until after she had already been beaten that he had, Mr. Smith had realized that she had been beaten. He went back into the station according to the complaint, banged on the door, wasn't able to get anyone to respond, called 9-1-1. So that's the actual notice to HPD is actually the phone call to 9-1-1 after she had already been beaten by Mr. Armstrong. Your opposing counsel talked about Wood versus Ostrander, which involved the woman who was dropped off in the middle of the night in a neighborhood known to be unsafe, analogized to this case, and how do you respond to that? My response to that would be to refer you to the Sinclair 9th Circuit case that makes it clear that the danger has to be particularized and directed to a specific victim. And so in this case, unlike in Wood, I don't think any officer was aware that Ms. Johnson was going to be exposed to Mr. Armstrong's assault on her. Right, but I think what what Mr. Seitz would say is, well we don't know that, but we we think that releasing somebody who's homeless and who's not mentally stable into an area that she's not familiar with is that's likely to end in something bad, whether it's Mr. Armstrong or something else. And he would say that's, I'm paraphrasing what I think his argument is, but I think he would say that's that's sufficient. And again, I would come back to it being a specific harm, that being the assault by Mr. Armstrong on Ms. Johnson. My position is it's not sufficient for there to just be a generalized harm to the general public. It has to be specific, the specific harm to the specific victim. And where are you drawing that from? Case law or which cases are you referring to? Specifically the Sinclair case. I'm sorry I don't have a citation for you, but I could get one if you needed it. So this would be a different case than if Mr. Armstrong had specifically stated he was going to harm. I'm gonna get her when I'm, you know, released. That's the difference. Is that, am I understanding you correctly? Yes, I think that's right. I think that's what he would have had to have known and what that harm would have been to her, right. In this case, I think it's only generally pled in the first amendment complaint that there are 15 states transporting arrestees to Kapolei Police Station might cause serious problems for persons like Linda Mae Johnson. But then those problems that are identified within the complaint are not having resources to obtain shelter, mental health care, substance abuse treatment, or other essential services, which is not that she would be subject to an assault by a third-party arrestee who gets released more than 30 hours after her release. I'm happy to answer any other questions that the court may have. I think we've exhausted them, so thank you very much. Thank you. In light of your discussion with opposing counsel, I just want to call your attention again to our reply brief at page six. There's a quote there from the Ninth Circuit in a case entitled Kennedy v. City of Richfield. I think it very accurately characterizes what the court found in Wood v. Ostrander. Again, bear in mind, in Wood v. Ostrander, the victim in that case was able-bodied. She didn't have any disabilities of any sort, but what the court said in the middle of that page is, we have never required that for a danger to exist, the exact injury inflicted by a third party must have been foreseeable. Instead, the state actor is liable for creating the foreseeable danger of injury given the particular circumstances. For example, in Wood, we did not speculate nor require that Trooper Ostrander foreseeably knew that Wood would in fact be raped by a third party. He could be liable, however, for leaving Wood in a situation more dangerous than the one she already faced, i.e. for stranding her alone in a known high-crime area at 2.30 in the morning. I think that is dispositive language and I would urge you please to consider that. Thank you again. Thank you. We thank both counsel for their arguments. This case is submitted. That concludes our calendar for the week. We want to thank the court staff here at the Bankruptcy Court and also the Ninth Circuit staff for their help in coordinating our sitting. I want to personally thank Judges Thomas and DeAlba for a wonderful week of hearing cases with both of you. That concludes our day. Thank you.
judges: THOMAS, BRESS, ALBA